UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

U.S. BANK NATIONAL ASSOCIATION, AS
TRUSTEE FOR THE REGISTERED HOLDERS OF
WELLS FARGO COMMERCIAL MORTGAGE
SECURITIES, INC., MULTIFAMILY MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 2019-
SB63, acting by and through its special
servicer, Berkeley Point Capital LLC
d/b/a Newmark, as Special Servicer
under the Pooling and Servicing
Agreement dated as of June 1, 2019,

**MEMORANDUM AND ORDER**

23-CV-8245(KAM)(TAM)

            *Plaintiff,*

     -against-

1078 WHILLMORE LLC; SAMUEL FLEISCHMAN;
NEW YORK CITY DEPARTMENT OF FINANCE;
NEW YORK CITY OFFICE OF ADMINISTRATIVE
TRIAL HEARINGS; and "JOHN DOE" NO. 1
THROUGH "JOHN DOE" NO. 100,

The names of the "John Doe" Defendants
being Fictitious and Unknown to
Plaintiff, the Persons and Entities
Intended Being Those Who May Be in
Possession of, or May Have Possessory
Liens or Other Interests in, the
Premises Herein Described,

            *Defendants.*

-------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

On November 6, 2023, Plaintiff U.S. Bank National Association

("Trustee"), as Trustee for the Registered Holders of Wells Fargo

Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-

Through Certificates, Series 2019-SB63 (the "Trust") (Trustee as

1

trustee of the Trust hereinafter referred to as "Plaintiff"), acting by and through its special servicer, Berkeley Point Capital LLC d/b/a Newmark ("Special Servicer"), as Special Servicer under the Pooling and Servicing Agreement dated as of June 1, 2019 (the "PSA"), brought this action against Defendants to foreclosure a mortgage in the original principal amount of $1,084,000.00. (ECF No. 1, Complaint ("Compl.").) Plaintiff brought this action against defendant 1078 Whillmore LLC (the "Borrower"), the mortgagor of the mortgage in question and the owner of the property securing the mortgage; along with defendant Samuel Fleischman (the "Guarantor"), the sole member of 1078 Whillmore LLC, who guaranteed Borrower's obligations under the note (together with the Borrower, the "1078 Whillmore Defendants"); and other defendants who might have possible claims against the property. (*Id.* at ¶¶ 4-6.)

Presently before the Court is the Plaintiff's Motion for the Appointment of a Receiver, as well as the 1078 Whillmore Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (*See* ECF No. 21, Plaintiff's Notice of Motion for the Appointment of a Receiver; ECF No. 27, 1078 Whillmore Defendants' Notice of Motion to Dismiss.) For the reasons set forth below, Plaintiff's motion is **GRANTED**, and the 1078 Whillmore Defendants' motion is **DENIED**.

<u>**BACKGROUND**</u>

2

The Court accepts the allegations in the Plaintiff's Complaint as true for purposes of the Motion to Dismiss. *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016).

## I.    Factual Background

Plaintiff, U.S. Bank National Association, brings this case acting solely in its capacity as Trustee for the Trust, acting by and through the Special Servicer under the PSA. (Compl. at ¶¶ 1-3.) Trustee is a national banking association with a designated main office located in Cincinatti, Ohio, (*id.* at ¶ 1), and is therefore a citizen of Ohio, *see Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006). The Borrower, Defendant 1078 Whillmore LLC, is a New York limited liability company which is the owner of 1078 Willmohr Street, Brooklyn, New York, identifiable as Block 4691, Lot 7 (the "Property"). (Compl. at ¶ 4.) The Guarantor, Defendant Samuel Fleischman, is the sole member of the Borrower LLC, and is a citizen of New York. (*Id.*)

The loan at issue in this case dates back to an agreement between the Borrower and The Community Preservation Corporation[1] ("CPC"), a New York not-for-profit corporation. (*Id.* at ¶ 16.) Pursuant to the loan agreement, dated December 27, 2018 (the "Loan Agreement"), CPC made a loan to the Borrower in the original

---

[1] According to the organization's website, The Community Preservation Corporation "is the largest Community Development Financial Institution (CDFI) in the nation solely focused on investing in multifamily housing." *About CPC*, https://communityp.com/about-us/ (last visited June 4, 2024).

principal amount of $1,084,000.00. (*Id.*) On the same date, the Borrower executed and delivered to CPC a Consolidated, Amended and Restated Note (the "Note") in the original principal amount of $1,084,000.00. (*Id.* at ¶ 17.) To secure payment of the note, the Borrower executed, acknowledged, and delivered to CPC a Multifamily Mortgage, Assignment of Rents and Security Instrument, dated as of December 27, 2018, and in the original principal amount of $1,084,000.00 (the "Mortgage"). (*Id.* at ¶ 18.) The Mortgage was included as an exhibit to a Consolidation, Extension and Modification Agreement (the "CEMA") dated December 27, 2018, and executed by the Borrower and CPC. (*Id.*) To further secure repayment, the Guarantor also executed a guaranty dated December 27, 2018, in which he guaranteed the full repayment of all amounts for which Borrower was personally liable (the "Guaranty"). (*Id.* at ¶ 23.)

CPC subsequently recorded the CEMA against the Property on January 4, 2019, in the Office of City Register of the City of New York (the "Register's Office") as City Register File Number ("CRFN") 2019000003514, and paid the mortgage recording taxes. (*Id.* at ¶ 19.) Because the Mortgage also grants the holder of the mortgage a security interest in the land, improvements, fixtures, personalty, leases, and rents associated with the Property (the "Collateral"), CPC also recorded on January 4, 2019, a Uniform Commercial Code ("UCC") Financing Statement with the Register's

4

Office as CRFN 2019000003516.  (*Id.* at ¶¶ 20-21.)  CPC further filed a UCC Financing Statement with the New York Secretary of State on January 9, 2019, to perfect its interest in the collateral.  (*Id.* at ¶ 22.)

Nearly simultaneous with the execution and recording of the above-mentioned instruments, CPC subsequently assigned or transferred its interest in the Mortgage and the Note to Federal Home Loan Mortgage Corporation (also known as "Freddie Mac[2]"). (*Id.* at ¶¶ 24-25.)  Freddie Mac recorded the assignment of the Mortgage in the Register's office as CRFN 2019000003515 on January 4, 2019.  (*Id.* at ¶ 25.)  CPC subsequently filed UCC Financing Statement Amendments with the Register's Office and Secretary of State assigning the respective UCC Financing Statements filed with each authority to Freddie Mac.  (*Id.* at ¶¶ 26-27.)

Thereafter, on June 21, 2019, Freddie Mac transferred to Plaintiff its right, title, and interest in the Note, and Plaintiff became the holder of the Note.  (*Id.* at ¶ 28.)  The transfer was made via an allonge to the Note, which was affixed to the Note when it was delivered to Plaintiff.  (*Id.*)  Freddie Mac also executed an assignment of the Mortgage in favor of Plaintiff on June 5, 2019, and on June 27, 2019, Plaintiff recorded the assignment of the Mortgage in the Register's Office as CRFN

---

[2] *See FHFA At-a-Glance,* FHFA, https://www.fhfa.gov/about (last visited June 5, 2024).

22019000203418.  (*Id.* at ¶ 29.)  CPC subsequently filed UCC Financing Statement Amendments with the Register's Office and Secretary of State assigning the respective UCC Financing Statements filed with each authority to Plaintiff. (Id. at ¶¶ 30-31.)

Pursuant to the Note, Borrower was obligated to make payments on the first day of each month, beginning on February 1, 2019, and concluding on January 1, 2039.  (*Id.* at ¶ 32.)  Pursuant to the Note and the Loan Agreement, if Borrower fails to pay the full amount of each payment on the date it is due, Borrower will be in default.  (*Id.* at ¶ 33; ECF No. 28-3, at 83.)  Also pursuant to the Note, Borrower is required to pay a late charge of 5% on any overdue payment or amount due, and upon Borrower's Default, the applicable interest rate on the loan will increase by 4%.  (Compl. at ¶¶ 34-35.)  According to the Complaint, Plaintiff, through the Special Servicer, notified the 1078 Whillmore Defendants on May 26, 2023, that Borrower had failed to remit the payment due on the March 2023 payment date, and demanded that Borrower pay all sums due and owed under the loan documents.  (*Id.* at ¶ 36.)

Borrower failed to pay the amount due following Plaintiff's first notice, and Plaintiff subsequently sent further notice on August 30, 2023, notifying the 1078 Whillmore Defendants of the outstanding amounts due under the loan documents.  (*Id.* at ¶¶ 37-38.)  Borrower also failed to pay the amount due following

6

Plaintiff's subsequent notice, and as such, Borrower has been in default since March 1, 2023. (*Id.* at ¶¶ 38-39.)

In addition to defaulting by failing to pay the amount due under the loan documents, Borrower also defaulted by failing to comply with its financial reporting obligations under the Loan Agreement. (*Id.* at ¶¶ 40-44.) Likewise, Guarantor has defaulted by failing to comply with his financial reporting obligations under the loan documents. (*Id.* at ¶¶ 45-48.)

The loan documents provide that upon Borrower's default, the holder of the Mortgage shall be entitled to collect the rents and profits from the Property, or to have a receiver appointed to take possession of the Property and to collect the rents and profits. (*Id.* at ¶ 49.) Furthermore, as a result of Borrower's default and failure to cure, Plaintiff revoked Borrower's license to collect the rents and profits generated by the Property, and accelerated all amounts owed under the loan documents. (*Id.* at ¶ 51.) Borrower has not paid the amounts due under the loan documents, nor has it turned over the rents and profits generated by the Property to Plaintiff. (*Id.*)

Plaintiff's complaint asserts several causes of action and seeks various forms of relief – (1) mortgage foreclosure; (2) security interest foreclosure; (3) possession; (4) appointment of a receiver; and (5) breach of the Guaranty. (*See generally id.*)

**II.  Procedural History**

7

Plaintiff commenced the instant case on November 6, 2023. (*See generally* Compl.)  Borrower was served on November 10, 2023, and Guarantor was served on November 13, 2023.  (ECF Nos. 8, 14.) After the time to answer had expired, on December 8, 2023, counsel for the 1078 Whillmore Defendants appeared and requested an extension of time to answer the complaint.  (ECF No. 12.)  As part of the request for an extension of time, to which Plaintiff consented, the 1078 Whillmore Defendants agreed to "waive any and all personal jurisdiction defenses and consent to the jurisdiction of this Court."  (*Id.* at 2.)  The Court granted the 1078 Whillmore Defendants' request for an extension of time, (Docket Order dated December 8, 2023), and Plaintiff subsequently moved on December 12, 2023, for a pre-motion conference in anticipation of filing a motion to appoint a receiver, (ECF No. 13.)

The Court denied Plaintiff's request for a pre-motion conference regarding the appointment of a receiver, waiving the requirement, and ordered Plaintiff to confer with all appearing defendants regarding appointment of a receiver on consent.  (Docket Order dated December 12, 2023.)   After the Court's order, but before Plaintiff had responded regarding defendants' consent to a receivership, the 1078 Whillmore Defendants moved on December 19, 2023, for a pre-motion conference in anticipation of a motion to dismiss.  (ECF No. 17.)  On the same day, Plaintiff filed a joint letter notifying the Court that the 1078 Whillmore Defendants would

8

not consent to the appointment of a receiver and would oppose any such motion.  (ECF No. 18.)

The Court held a combined pre-motion conference to discuss both anticipated motions the following day, on December 20, 2023. (Minute Entry dated December 20, 2023.)  The Court noted that, based on the 1078 Whillmore Defendants' arguments made in their pre-motion letter, "a motion to dismiss would appear to be premature in the absence of additional documentary evidence" and the Court accordingly ordered Plaintiff to produce the documents referenced in the 1078 Whillmore Defendants' pre-motion letter by January 12, 2024.  (*Id.*)  The Court explained that it "expected that such production would obviate the need for motion practice regarding the motion to dismiss" and that the 1078 Whillmore Defendants' would submit their answer or motion to dismiss one week thereafter, on January 19, 2024.  (*Id.*)  The Court subsequently set out a briefing schedule for the receivership motion and ordered that any cross-motion to dismiss filed by Defendants would follow the same schedule.  (*Id.*)

As ordered by the Court, Plaintiff submitted additional documentary evidence to the 1078 Whillmore Defendants on January 12, 2024, including: (1) the Loan Agreement executed by and between Borrower and CPC on December 27, 2018; (2) the CEMA executed by and between Borrower and CPC on December 27, 2018; (3) the Note in the original amount of $1,084,000.00; (4) the Guaranty dated

December 27, 2018; (5) the assignment of security instruments from CPC to Freddie Mac; (6) the assignment of the Mortgage dated June 5, 2019, from Freddie Mac to Plaintiff; and (7) the PSA dated June 1, 2019.   (*See* ECF No. 27-2, Exhibit A to Declaration of Christopher Gorman; ECF No. 28-2, Exhibit B to Declaration of David Mignardi.)

On January 19, 2024, rather than answer the complaint, the 1078 Whillmore Defendants, apparently not satisfied with Plaintiff's production of documents, served a motion to dismiss on Plaintiff.  (ECF No. 27, Notice of Motion to Dismiss; ECF No. 27-10, Memorandum of Law in Support of Motion to Dismiss ("Def't Mem.").)  Plaintiff opposed the motion to dismiss, and the 1078 Whillmore Defendants submitted a memorandum in further support. (ECF No. 29, Plaintiff's Memorandum in Opposition ("Pl. Opp."); ECF No. 30, Defendants' Reply Memorandum of Law ("Def't Reply").) Plaintiff's motion to appoint a receiver was also being briefed at the same time as the motion to dismiss, consistent with the Court's scheduling order.   (ECF No. 21, Notice of Motion to Appoint Receiver; ECF No. 24, Plaintiff's Memorandum of Law in Support ("Pl. Mem."); ECF No. 25-7, Defendants' Memorandum of Law in Opposition ("Def't Opp."); ECF No. 26, Plaintiff's Reply Memorandum of Law in Further Support ("Pl. Reply").)  The cross-motions were both fully briefed on February 12, 2024.

## **LEGAL STANDARD**

## I.   Motion to Dismiss under Rule 12(b)(1)

Federal courts have inherent power under Rule 12(b)(1) to dismiss claims for which subject matter jurisdiction is lacking. *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).  In considering a motion to dismiss under Rule 12(b)(1), the "[C]ourt must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff."  *Id.* (internal quotation marks and citation omitted).  The Court may also "consider evidence outside the pleadings," in considering a Rule 12(b)(1) motion.  *Id.* (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

"An objection to standing is properly made on a Rule 12(b)(1) motion."  *Tasini v. N.Y. Times Co.*, 184 F. Supp. 2d 350, 354-55 (S.D.N.Y. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998)).  "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To survive a Rule 12(b)(1) motion to dismiss, there must be facts plausibly establishing that the plaintiff has standing to sue.  *Carter*, 822 F.3d at 56-57.

## II.  Motion to Dismiss under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

11

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).  Although "detailed factual allegations" are not required, "[a] pleading that offers labels or conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks and citation omitted).

## DISCUSSION

The Court will first examine Defendants' motion to dismiss before turning to Plaintiff's motion to appoint a receiver, given the latter motion would be moot if Plaintiff's complaint were to be dismissed.  *See, e.g., Sec. & Exch. Comm'n v. Republic Nat. Life Ins. Co.*, 378 F. Supp. 430, 437 (S.D.N.Y. 1974) (considering motion to dismiss SEC's complaint prior to the SEC's motion for the appointment of a receiver).

## I.   Standing

The 1078 Whillmore Defendants request that the Complaint "be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(6)." (Def't Mem. at 1.)  Notwithstanding this request, the 1078 Whillmore Defendants' primary argument appears to be that Plaintiff "has failed to meet its burden of establishing standing" to bring the instant action.  (*Id.* at 2.)  "Although standing

12

challenges have been brought under Rule 12(b)(6), 'the proper procedural route is under Rule 12(b)(1).'" *Lugones v. Pete and Gerry's Organic*, 440 F. Supp. 3d 226, 237 (S.D.N.Y. 2020) (quoting *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006)). "Where, as here, the defendant moves for dismissal under Rule 12(b)(1) . . . as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first." *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155-56 (2d Cir. 1993) (internal quotation marks and citation omitted). Accordingly, the Court first addresses the 1078 Whillmore Defendants' Rule 12(b)(1) standing arguments, followed by their Rule 12(b)(6) arguments.

### A.   Legal Standard

"Federal courts are courts of limited jurisdiction that possess only that power authorized by [the] Constitution and statute." *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir. 2015) (internal quotation marks omitted). "The irreducible constitutional minimum of standing derives from Article III, Section 2 of the U.S. Constitution, which limits federal judicial power to cases and controversies." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013) (internal quotation marks and citations omitted).

To establish Article III standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete,

13

particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)) (hereafter *TransUnion*). At the pleading stage, a plaintiff "bears the burden of alleging facts that affirmatively and plausibly suggest that [he or she] has standing to sue." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (internal quotation marks and citation omitted).

### B.   Plaintiff has Adequately Alleged Standing

The 1078 Whillmore Defendants argue that Plaintiff lacks standing to maintain this foreclosure action.  Essentially, the 1078 Whillmore Defendants' argument rests on one specific factual contention: that Plaintiff has failed to show that the allonge to the Note was "firmly affixed" as required by UCC 3-202(2). (Def't Mem. at 7.)   UCC 3-202(2) requires, in relevant part that "an [e]ndorsement [to an instrument] must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof."  In making their argument, the 1078 Whillmore Defendants state that "[w]here the plaintiff's standing has been placed in issue, the plaintiff must prove its standing in order to prosecute its case." (*Id.* at 5 (citing *U.S.*

14

*Bank Nat'l Ass'n v. Moulton*, 116 N.Y.S.3d 86 (2d Dep't 2020)).) The 1078 Whillmore Defendants misstate the law.

*Moulton* involved a motion for summary judgment by the Plaintiff – the full quote to which the 1078 Whillmore Defendants were referring is as follows: "[w]here, as here, the plaintiff's standing has been placed in issue by the defendant's answer, the plaintiff must prove its standing as part of its prima facie showing *on a motion for summary judgment*." *Moulton*, 116 N.Y.S.3d at 89 (emphasis added). As correctly noted by Plaintiff in its opposition, on a motion to dismiss in a mortgage foreclosure action, "the burden is on the moving defendant[s] to establish, prima facie, the plaintiff's lack of standing as a matter of law" and "[t]he burden is not on the plaintiff to affirmatively establish its standing for the dismissal motion to be denied." *Wilmington Sav. Fund Soc'y, FSB v. Matamoro*, 156 N.Y.S.3d 323, 333 (2d Dep't 2021). As such, the burden is on the 1078 Whillmore Defendants to make a prima facie showing of Plaintiff's lack of standing.

The 1078 Whillmore Defendants have failed to make any such showing of Plaintiff's lack of standing. Plaintiffs set forth in the Complaint a series of two transfers of the Note – from the original lender, CPC, to Freddie Mac, and from Freddie Mac to Plaintiff – which were conducted by an allonge to the note. (Compl. at ¶¶ 24, 28.) In both instances, Plaintiff's complaint

15

alleges that the allonges were "affixed" to the Note. (*Id.*)  The 1078 Whillmore Defendants argue that Plaintiff "failed to include any information along with its Complaint to describe how the purported allonges [were] purportedly affixed to the Note (if at all)," (Def't Mem. at 8), but Plaintiff's allegation is sufficient to establish that the allonges were affixed to the Note.  For this same reason, the authority cited by the 1078 Whillmore Defendants, nearly all of which involves a plaintiff moving for summary judgment, is inapplicable and unpersuasive. *See, e.g., Wells Fargo Bank, N.A. v. Mitselmakher*, 190 N.Y.S.3d 397, 398 (2d Dep't 2023) (appeal from grant of summary judgment); *Raymond James Bank, NA v. Guzzetti*, 158 N.Y.S.3d 881, 882 (2d Dep't 2022) (same); *Fed. Nat'l Mortg. Ass'n v. Hollien*, 154 N.Y.S.3d 572, 574 (2d Dep't 2021) (same); *LNV Corp. v. Almberg*, 143 N.Y.S.3d 587, 588 (2d Dep't 2021) (same); *Moulton*, 116 N.Y.S.3d at 89 (same).

Perhaps the only authority cited by the 1078 Whillmore Defendants that is even applicable to the instant action is *HSBC Bank USA, N.A. v. Roumiantseva,* 115 N.Y.S.3d 117 (2d Dep't 2015). In *Roumiantseva*, on a motion to dismiss, the court found that the plaintiff did not have standing to bring suit because the nominee of the original lender, which assigned the mortgage and note to the plaintiff, "was never the holder of the note and, therefore, was without authority to assign the note."  *Id.* at 119.  After concluding that the nominee was without authority to assign the

note, the court noted that a "purported endorsement [produced by the plaintiff], attached by a paperclip, was not so firmly affixed to the note as to become a part thereof." *Id.* at 120.  The 1078 Whillmore Defendants fail to grapple with authority from within the circuit showing their reliance on *Roumiantseva* to be misplaced.

As noted by Magistrate Judge Gold in *Courchevel 1850 LLC v. Alam*, No. 17-CV-785 (JBW) (SMG), 2019 WL 9656366 (E.D.N.Y. Oct. 30, 2019), *report and recommendation adopted*, 464 F. Supp. 3d 475 (E.D.N.Y. 2020), in *Roumiantseva* "it appeared . . . that the entity purportedly assigning the note and mortgage was in fact never the holder of the note." *Id.* at *11.  The 1078 Whillmore Defendants have cited no such defect in the assignment of the Note and Mortgage in the instant case.  Magistrate Judge Gold further noted that, in a separate case affirmed by the Second Circuit, a plaintiff "had standing to foreclose even though the relevant allonge was not physically affixed to the underlying note at time of assignment." *Id.* (citing *Robinson v. H & R Block Bank, FSB*, 2013 WL 2356106, at *2 (E.D.N.Y. May 29, 2013), *aff'd*, 562 F. App'x 12 (2d Cir. 2014)).

More importantly, even if the 1078 Whillmore Defendants had pointed out some defect in the way the allonge was affixed in the instant case, which they do not, Plaintiff would be able to establish standing on other, independent grounds.  To establish standing in a mortgage foreclosure action, the Plaintiff must

17

demonstrate "that, when the action was commenced, it was either the holder or assignee of the underlying note." *Eastern Savings Bank, FSB v. Thompson*, 631 F. App'x 13, 15 (2d Cir. 2015) (internal quotation marks and citation omitted). "Notably, either a written assignment of the underlying note or the physical delivery of the note prior to the commencement of the foreclosure action is sufficient to transfer the obligation, and the mortgage passes with the debt as an inseparable incident." *Id.* (internal quotation marks and citation omitted).

Plaintiff alleged in its complaint that Freddie Mac "delivered the note, with the Plaintiff Allonge affixed thereto, to Plaintiff." (Compl. at ¶ 28.) Plaintiff also submitted a declaration of Robert Doust, a director with the Special Servicer who was authorized to make a declaration on behalf of Plaintiff, which states that Mr. Doust "reviewed the allegations in the complaint . . . and [verifies] that the facts in the complaint are true and correct." (ECF No. 23, Declaration of Robert Doust ("Doust Decl."), at 2.) Such possession of the note with the allonge affixed is sufficient for standing in the instant case. *OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 223 (2d Cir. 2016) ("New York courts have repeatedly held that proof of physical possession [of the note] . . . is sufficient on its own to prove a plaintiff's standing to foreclose on the mortgage associated with the note.")

The 1078 Whillmore Defendants attempt to discount the Doust Declaration on a technicality, arguing that "there is no proof in the record in the form of a power of attorney or any other document to establish [the special servicer's] or Doust's authority to speak on Plaintiff's behalf." (Def't Reply at 4.)  The Court notes that the caselaw cited by the 1078 Whillmore Defendants dealt with procedural requirements for motions for default judgment under New York law, which is not applicable here. *See HSBC Bank USA, N.A. v. Betts*, 888 N.Y.S.2d 203, 204 (2d Dep't 2009) ("Where, as here, a foreclosure complaint is not verified, CPLR 3215(f) states, among other things, that upon any application for a judgment by default, proof of the facts constituting the claim, the default, and the amount due are to be set forth in an affidavit 'made by the party.'")

Even ignoring the fact that the caselaw cited by the 1078 Whillmore Defendants involved a different procedural posture, the Pooling and Servicing Agreement dated as of June 1, 2019 ("PSA") explicitly states that the Special Servicer (which the Court notes is referenced in the caption of the Complaint) is entitled to "full power and authority . . . to do or cause to be done any and all things in connection with such servicing and administration [of the loans] which it may deem necessary or desirable." (ECF 27-9,

Exhibit H to the Gorman Decl. ("Gorman Decl. Ex. H"), at 113[3].)
As noted by Plaintiff, one of the "things" which the Special
Servicer has "full power and authority" to do is initiate
foreclosure proceedings, as in the instant case, on the Trust's
behalf. (*Id.* at 173.)  As such, the Court finds that Mr. Doust,
a representative of the Special Servicer, had authority to make a
declaration on behalf of Plaintiff in the instant case – a
conclusion numerous other courts in this circuit have reached in
evaluating motions for summary judgment. *See, e.g., Wilmington
Tr., N.A., as Tr. for Benefit of Registered Holders of Wells Fargo
Com. Mortg. Tr. 2018-C44, Com. Mortg. Pass-Through Cerificates,
Series 20 v. 31 Prince St., LLC*, No. 22-CV-5855 (JGK), 2023 WL
3647397, at *3 (S.D.N.Y. May 25, 2023) ("the plaintiff has provided
a 'Pooling and Services Agreement' authorizing Rialto Capital
Advisors, LLC to act as Special Servicer the plaintiff's behalf");
*Wells Fargo Bank, N.A. as Tr. for Benefit of Holders of CD 2018-
CD7, Mortg. Tr. Com. Mortg. Pass-Through Certificates, Series
2018-CD7 v. Prince 26, LLC*, No. 22-CV-5586 (PAE)(OTW), 2023 WL
5152420, at *7 n.3 (S.D.N.Y. Aug. 10, 2023) (finding an identical
defense lacked merit where PSA conferred "the power to bring this
action on behalf of [plaintiff]").  Furthermore, even if the Court
discounted the Doust Declaration, the 1078 Whillmore Defendants

---

[3] The Court utilizes the PSA's page numbering for pincites to the PSA, and not
the page number assigned by ECF.

fail to dispute the facts alleged in the Complaint showing that
Plaintiff was in physical possession of the Note and allonge at
the time it commenced the foreclosure proceeding.

Ultimately, the 1078 Whillmore Defendants' arguments against
Plaintiff's standing are unpersuasive and appear to be nothing
more than an attempt to delay Plaintiff's ability to seek a
receivership, and ultimately foreclose on the property.  Though
the 1078 Whillmore Defendants have succeeded in delaying
Plaintiff's request for a receivership, their arguments regarding
Plaintiff's lack of standing fail.

## II.  Failure to State a Claim

### A.   The Statute of Frauds Does Not Bar Plaintiff's Claims

Having concluded that Plaintiff had standing to commence this
action when it filed the Complaint, the Court next turns to the
1078 Whillmore Defendants' arguments regarding dismissal on other
grounds.  The 1078 Whillmore Defendants also argue that Plaintiff's
complaint should be dismissed because the Mortgage was not signed
by the Borrower, in contravention to the Statute of Frauds, and
also argue that Plaintiff's claims for a deficiency judgment should
be dismissed based on the text of the loan documents.  As with the
1078 Whillmore Defendants' arguments regarding standing, neither
of their additional arguments is persuasive.

The 1078 Whillmore Defendants again attempt to prevail on an
unfounded technicality in arguing that the Mortgage was not signed.

21

As part of this Court's attempt to obviate the need for briefing
on a motion to dismiss, the Plaintiff produced several documents
to the 1078 Whillmore Defendants, including the CEMA executed by
and between Borrower and CPC on December 27, 2018.  (ECF No. 23-
3, Exhibit 3 to the Doust Declaration ("Doust Ex. 3").)  Perhaps
anticipating that the 1078 Whillmore Defendants would notice the
lack of a signature on the Mortgage, which is included as an
exhibit to the CEMA, Plaintiff explained in its production letter
to the 1078 Whillmore Defendants that "it is the CEMA, itself,
that is the operative document, not the Consolidated Mortgage."
(ECF 27-2, Exhibit A to the Gorman Decl., at 3.)    Plaintiff
further explained that, as part of the CEMA, Borrower agreed that
the CEMA "consolidates the rights and obligations under the
Existing Mortgages" and that "the Consolidated Mortgage was
incorporated into and made a part of the CEMA in Section 7
thereof."  (*Id.*)  Plaintiff included quotations from the CEMA in
support of both points.

The 1078 Whillmore Defendants, ignoring Plaintiff's attempts
to obviate the need for costly and unnecessary litigation regarding
the lack of signature on the copy of the Mortgage annexed to the
CEMA (which was signed by Borrower) make a number of arguments
about why the Mortgage should be considered in isolation and not
alongside the CEMA.  None are persuasive.  As the Plaintiff notes,
the CEMA *explicitly* states that the Mortgage, as Exhibit C to the

CEMA, is "incorporated into and made a part of [the CEMA]." (Doust Ex. 3 at 6[4].)  The Second Circuit has encountered a very similar situation previously, as Plaintiff also notes, and concluded that a CEMA may properly incorporate the terms of a mortgage, notwithstanding the lack of a signature on the incorporated mortgage. *Nucci v. PHH Mortg. Corp.*, 679 F. App'x 48, 51 (2d Cir. 2017) ("the documents [plaintiff] attached to his complaint conclusively establish that the CEMA he signed expressly incorporates the terms of the consolidated mortgage he disputes as invalid for lack of a signature").  Furthermore, as noted by the district court in *Nucci* in the order which the Second Circuit affirmed, "by signing the CEMA, [the borrower] agreed to be bound by its terms, as well as the documents annexed to it and to which it specifically referred, i.e., the Consolidated Mortgage." *Nucci v. PHH Mortg. Corp.*, No. 14-CV-2683 (NGG)(RML), 2016 WL 1070815, at *4 (E.D.N.Y. Mar. 16, 2016).

Here, too, the CEMA incorporates the Mortgage, by its own terms, and Borrower's sole member, Guarantor, signed the CEMA. (Doust Ex. 3 at 7.)  A notary public attested to the fact that Guarantor signed the CEMA, (*id.* at 9) and the 1078 Whillmore Defendants make no attempt to dispute the fact that Guarantor, the

---

[4] Because Exhibit 3 to the Doust Declaration includes multiple documents which are each separately paginated, the Court's pincites reference the ECF-assigned page number.

sole member of Borrower, signed the document on behalf of Borrower. New York courts have clearly stated that where "a borrower executes a CEMA and consolidated note providing that the prior notes underlying the mortgage have been consolidated into a new single lien, the plaintiff may establish its standing to commence a mortgage foreclosure action by producing the CEMA and consolidated note." *Deutsche Bank Nat'l Tr. Co. v. Goldstone*, 153 N.Y.S.3d 523, 525 (2d Dep't 2021). Plaintiff has produced both documents, properly signed by Guarantor on behalf of Borrower. The Court need not consider the 1078 Whillmore Defendants' arguments regarding the statute of frauds.

**B.  Plaintiff Properly Seeks a Deficiency Judgment**

The 1078 Whillmore Defendants' final challenge to Plaintiff's complaint concerns one of the forms of relief requested – namely, a deficiency judgment against Borrower and Guarantor. (Def't Mem. at 16.) The 1078 Whillmore Defendants argue that "Plaintiff has not pled facts sufficient to establish that Defendants are 'liable for the payment of the debt secured by the mortgage' under the operative loan documents such that they would be responsible under [Real Property Actions and Proceedings Law ("RPAPL")] § 1371 for 'the whole residue, or so much thereof as the court may determine to be just and equitable, of the debt remaining unsatisfied' at any foreclosure sale at the conclusion of this case." (*Id.* at 17.) Essentially, the 1078 Whillmore Defendants argue that based

on the terms of the Loan Agreement, the Loan would only become "full recourse" to the Borrower under limited circumstances, for which Plaintiff has not alleged sufficient facts. (*Id.* at 18.)

RPAPL § 1371(1) provides that "[i]f a person who is liable to the plaintiff for the payment of the debt secured by the mortgage is made a defendant in the action . . . the final judgment may award payment by him of the whole residue, or so much thereof as the court may determine to be just and equitable, of the debt remaining unsatisfied." As noted by the 1078 Whillmore Defendants, the key factual issue is whether Borrower and Guarantor are liable for a deficiency judgment under the Loan Agreement in the instant case. At this stage in the proceedings, the Court finds that Plaintiff has met its burden of alleging facts sufficient to show that a deficiency judgment may be appropriate under the Loan Agreement.

Although the 1078 Whillmore Defendants correctly note that the Loan in the instant case is not a "full recourse" loan absent certain circumstances, Plaintiff accurately counters that the Loan Agreement nonetheless makes Borrower (and accordingly, Guarantor) personally liable for certain losses incurred by Plaintiff. (Pl. Opp. at 13.) Specifically, Section 3.02 the Loan Agreement provides that Borrower will be personally liable to Lender for the Base Recourse (which is 0% of the loan, as the loan is not a full recourse loan) "*plus any other amounts for which Borrower has*

*personal liability under Article III*."  (ECF 23-1, Exhibit 1 to the Doust Declaration ("Doust Decl. Ex. 1"), at 1-3[5].)   Section 3.03 goes to explain the various events that could cause Borrower to become personally liable to Plaintiff "for the repayment of a portion of the Indebtedness equal to any loss or damage suffered by [Plaintiff] as a result of the occurrence of any" of the listed events.  (*Id.* at 3.)  Two of the events specified in Section 3.03 have already occurred, based on the facts alleged in Plaintiff's complaint.

Based on the facts alleged in the Complaint, Borrower did not comply with its financial reporting obligations under the Loan Agreement because it failed to deliver "(i) a 2022 Rent Schedule and 2022 annual statement of income and expenses within ninety (90) days of the end of the 2022 calendar year in accordance with Section 6.07(b) of the Loan Agreement; and (ii) a 2023 mid-year Rent Schedule within twenty-five (25) days of the end of the second quarter of the 2023 calendar year in accordance with Section 6.07(c) of the Loan Agreement."  (Compl. at ¶ 42.)  By failing to comply with the financial reporting obligations after being put on notice by Plaintiff, Borrower was in default of its financial reporting obligations, and the Loan Agreement, since October 23, 2023.  (*Id.* at ¶¶ 43-44.)  Section 3.03(j) of the Loan Agreement

---

[5] For Exhibit 1 to the Doust Declaration, the Court's pincites refer to the page numbering included in the Loan Agreement, not the ECF-assigned page number.

includes, as one of the events that could cause Borrower to become personally liable to Plaintiff, the following: "[i]f an Event of Default has occurred and is continuing, Borrower fails to deliver all Books and Records, contracts, Leases and other instruments relating to the Mortgaged Property or its operation in accordance with the provisions of Section 6.07." (Doust Decl. Ex. 1 at 4.) Thus, Plaintiff has adequately pled that Borrower could be liable for a deficiency judgment and need not establish the exact damages it suffered at the motion to dismiss stage of litigation. *See, e.g., Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.*, 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) ("such questions are appropriately handled at summary judgment or trial, not on a motion to dismiss . . . At this stage, [plaintiff] need only put [defendant] on notice of its claims . . . [and] need only allege that it was damaged; it is not required to specify the measure of damages . . . .")

Similarly, Plaintiff adequately alleges facts in the Complaint to show that Borrower has not "turned over the rents and profits generated by the Property to Plaintiff" following an event of default under the Loan Agreement. (Compl. at ¶ 51.) Under Section 3.03(i) of the Loan Agreement, the failure to pay such rents to Plaintiff after an event of default also subjects Borrower to personal liability for damages suffered by Plaintiff. (Doust Decl. Ex. 1 at 4.) Therefore, Borrower could potentially face

liability beyond foreclosure alone under this provision of the Loan Agreement, as well.  Because Guarantor personally guaranteed, under Section 3(a) of the Guaranty, payment "of all amounts for which Borrower is personally liable under Article III of the Loan Agreement," he would likewise be liable for any deficiency judgment pursuant to Section 3.03(i) or (j) for which Borrower was liable. (ECF 23-6, Exhibit 6 to the Doust Declaration ("Doust Decl. Ex. 6"), at 1[6].)

Contrary to the 1078 Whillmore Defendants' suggestions, Plaintiff is not barred from seeking a deficiency judgment simply because the loan is not non-recourse and Plaintiff has not alleged facts to show that the "full recourse" provisions of the Loan Agreement were triggered.  (Def't Reply at 13.)  New York courts have repeatedly stated that non-recourse loan agreements with carve-out provisions providing for "personal liability for a violation of certain enumerated exceptions" are valid and enforceable.  *G3-Purves St., LLC v. Thomson Purves, LLC*, 953 N.Y.S.2d 109, 112 (2d Dep't 2012); *see also Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (1st Dept 2010) (enforcing terms of guaranty against guarantors for failing to pay real estate taxes, which triggered liability under nonrecourse loan).  Although most of the caselaw involves "full recourse" or

---

[6] For Exhibit 6 to the Doust Declaration, the Court's pincites refer to the page numbering included in the Guaranty, not the ECF-assigned page number.

"springing recourse" provisions in loan documents, the events triggering personal liability in the Loan Agreement serve the same function as a "carveout" for personal liability in what is otherwise a non-recourse loan.  Accordingly, the Court finds no basis to grant the 1078 Whillmore Defendants' motion to dismiss Plaintiff's request for a deficiency judgment at this stage in the litigation, and the motion is respectfully denied.

## III. Motion to Appoint a Receiver

Having addressed the 1078 Whillmore Defendants' arguments regarding dismissal of the Complaint, and finding the arguments to be without merit, the Court next turns to Plaintiff's motion to appoint a receiver.  Plaintiff has moved for this Court to appoint Orazio Crisalli[7], of Syracuse Realty Group, LLC, as receiver of the Borrower's Assets pursuant to Fed. R. Civ. P. 66.  The Court finds such an appointment to be appropriate.

### A.   Legal Standard

"Whether a federal court should appoint a receiver in a diversity action is governed by federal law."  *U.S. Bank N.A. v. Nesbitt Bellevue Property LLC*, 866 F. Supp. 2d 247, 249 (S.D.N.Y. 2012) (citing *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000)).  "The appointment of a receiver is considered to

---

[7] Because the 1078 Whillmore Defendants do not address the proposed receiver's qualifications and Plaintiff extensively briefed that issue, the Court deems Plaintiff's position on Orazio Crisalli's qualifications to be unopposed.

be an extraordinary remedy, and should be employed cautiously and granted only when clearly necessary to protect plaintiff's interests in the property." *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir.1997) (internal alterations and quotation marks omitted). "The following factors are relevant to establishing the need for a receivership:

> 'Fraudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.'"

*Varsames*, 96 F. Supp. 2d at 365 (quoting 12 Wright & Miller, Federal Practice & Procedure § 2983 (1999)) (internal alterations omitted).

Courts in this circuit examining a motion for the appointment of a receiver have noted that the existence of contractual language providing "the mortgagee a specific right to an appointment [of a receiver] . . . is a factor militating in [the] plaintiff's favor, and the party opposing the appointment bears the burden of demonstrating why a receiver should not be appointed." *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.*, 550 F. Supp. 2d 481, 491 (S.D.N.Y. 2008). Notwithstanding the above, Courts retain "the discretion to deny appointment of a receiver under

30

appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment." *Ariani, Inc. v. 1075 Concourse Tenants Corp.*, No. 93-CV-377 (RCC), 1999 WL 637238, at *2 (S.D.N.Y. Aug. 20, 1999) (citing *Foxfire Enterprises, Inc. v. Enterprise Holding Corp.*, 837 F.2d 597, 598 (2d Cir. 1988)).

### B.   Analysis

Plaintiff argues in support of its motion to appoint a receiver that the appointment of a receiver "is appropriate not only because federal law expressly authorizes it but because the Loan Documents memorialize Borrower's express consent to such an appointment following Borrower's default." (Pl. Mem. at 4.) Plaintiff further argues that many of the relevant factors noted *supra* weigh in favor of a receivership. (Pl. Mem. at 4-6.) Plaintiff's submissions also include the declaration of Mr. Doust, discussed previously, which, in addition to verifying the contents of the complaint, also includes factual information on circumstances warranting receivership. (Doust Decl. at ¶¶ 21-29; Exhibits 12-13 to the Doust Decl.)

The 1078 Whillmore Defendants argue in opposition that the Doust Declaration should not be considered because, as already discussed *supra*, Plaintiff has not provided proof that Mr. Doust or the Special Servicer acts for Plaintiff. (Def't Opp. at 5-8.) The 1078 Whillmore Defendants further argue that the Doust Declaration does not specify whether Mr. Doust was "personally

31

familiar with Plaintiff's record-keeping practice and procedures" and therefore the attached business records regarding the necessity of a receivership are inadmissible hearsay.[8] (*Id.* at 8-12.)  The 1078 Whillmore Defendants next argue that Plaintiff failed to submit a payment history alongside their motion papers and do not show sufficient proof of Defendants' default.  (*Id.* at 12-14.)  Finally, the 1078 Whillmore Defendants dedicate the balance of their motion papers arguing that the relevant factors weigh against the appointment of a receiver.  (*Id.* at 14-19.)

### 1.   Plaintiff's Evidence is Properly Authenticated

The Court has previously addressed the 1078 Whillmore Defendants' arguments that the Special Servicer, and Mr. Doust, were not authorized to make a declaration on Plaintiff's behalf, and need conduct no further analysis to conclude that the Defendants' argument lacks merit.  The 1078 Whillmore Defendants' arguments that the exhibits attached to the Doust Declaration are not authenticated as business records is similarly unavailing.

Federal Rule of Evidence 803(6) provides a "business records exception" to the rule against hearsay and allows the admission of records "kept in the course of a regularly conducted activity."  Fed. R. Evid. 803(6).  So long as the records are both integrated

---

[8] The 1078 Whillmore Defendants cite only New York state caselaw in support of this argument, but the Court notes that "[r]ules of evidence . . . are generally considered procedural in nature . . . [so] the Federal Rules of Evidence, rather than state evidentiary laws, apply here."  *De Larancuente v. Am. Airlines, Inc.*, No. 18-CV-4939 (NG)(RER), 2022 WL 2239556, at *3 (E.D.N.Y. June 22, 2022).

into a company's records and relied on in that company's day-to-day activities, then "[e]ven if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity." *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir. 1992); *see also United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014).

Mr. Doust states that "all the exhibits attached to the complaint and/or this declaration were received, created, or otherwise generated at or near the dates reflected on such documents" based on his "review of and familiarity with Plaintiff's records, maintained by the Special Servicer." (Doust Decl. at ¶ 3.)  Mr. Doust further states that "[i]n connection with performing its duties as Special Servicer for Plaintiff, Special Servicer creates, receives, and maintains records, including the exhibits attached to the complaint and/or this declaration, in the regular course of the Special Servicer's business activities."  (*Id.*) Accordingly, the Doust Declaration lays a proper foundation for the exhibits to be introduced as business records under Federal Rule of Evidence 803(6).[9]  *See, e.g., Wells Fargo Bank v. Prince*

---

[9] Even if, *arguendo*, New York law did apply, Plaintiff has established that "the records provided by the maker were incorporated into the recipient's own records and routinely relied upon by the recipient in its own business," *see Bank of New York Mellon v. Gordon*, 97 N.Y.S.3d 286, 296 (2d Dep't 2019), such that the records would also be admissible under CPLR § 4518(a), New York's business records statute. *See Bank of Am., N.A. v. Bloom*, 202 A.D.3d 736, 738, 162 N.Y.S.3d 136 (2d Dep't 2022) (holding that loan servicer established foundation

*26, LLC,* No. 22-CV-5586 (PAE) (OTW), 2023 WL 5152420, at *6-7 (S.D.N.Y. Aug. 10, 2023) (finding a declaration sufficient under 803(6) when the declarant attested that he was familiar with the special servicer's record-keeping practices and procedures, that he conducted a review of the business records, and that all of the attached exhibits were true and correct copies of the business records); *CIT Bank N.A. v. Elliott, No. 15-CV-4395 (JS) (ARL),* 2019 WL 4439347, at *1 (Sept. 17, 2019) (same).

### 2.   Sufficient Evidence Shows Borrower is in Default

The Court also does not find persuasive the 1078 Whillmore Defendants' argument that Plaintiff has failed to provide sufficient proof of payment default under the mortgage to support the Complaint's allegations of a payment default.  This argument is all the more puzzling because the 1078 Whillmore Defendants, through the affidavit of Samuel Fleischman (who is the Guarantor and the sole member of 1078 Whillmore LLC), admit that Guarantor was aware of "a shortfall of funds ranging between $50,000 and $60,000 to pay the mortgage payments" and that his property manager made him aware of "three (3) months of allegedly missed payments of the mortgage."  (ECF No. 25-2, Affidavit of Samuel Fleischman ("Fleischman Aff."), at ¶¶ 19-20.)   Guarantor also argues,

---

for admissibility of loan records with testimony that records were received from plaintiff, incorporated into loan servicer's files, and regularly relied on by loan servicer in its own business).

erroneously, in his Affidavit that "the Lender has increased the monthly mortgage payments without explanation." (*Id.* at ¶ 27.)

A review of the underlying documents makes clear the source of Guarantor's erroneous statement. Plaintiff's Note states that, during the 60-month fixed rate period, the fixed monthly principal and interest payment amount will be $5,364.41. (ECF No. 23-2, Exhibit 2 to the Doust Declaration ("Doust Decl. Ex. 2"), at 2[10].) Attached to his Affidavit as Exhibit E, Guarantor includes records of payments made. (ECF 25-6, Exhibit E to the Fleischman Aff. ("Fleischman Aff. Ex. E").) Contrary to Guarantor's suggestions, the mortgage installments did not "increase[] from $5,364.41 . . . to $6,372.00 in August 2020," (Fleischman Aff. at ¶ 28), rather, the fixed monthly principal payment and interest payment of $1,448.90 and $3,915.51 remained at $5,364.41 combined, and the purported "increase" was instead the "Tax/Insurance Escrow" payment[11], (Fleischman Aff. Ex. E, at 2[12]).  The further increases cited by Guarantor all similarly fall under the "Tax/Insurance Escrow" payment until December 2021. (*Id.* at 3-18.)

---

[10] For Exhibit 2 to the Doust Declaration, the Court's pincites refer to the page numbering included in the Note, not the ECF-assigned page number.
[11] Section 4.02 of the Loan Agreement provides that "Borrower will deposit with Lender on the Closing Date and on each Payment Date under the Note an additional amount sufficient to accumulate with Lender the entire sum required to pay, when due, Taxes ("Tax Reserve Fund") and Insurance premiums ("Insurance Reserve Fund"). (Doust Decl. Ex. 1 at 7.)
[12] Because Exhibit E to the Fleischman Affidavit is not internally paginated, the Court utilizes the ECF-assigned page number for its pincites.

Beginning in January 2022, Guarantor's records show that Borrower began to incur late charges[13], compounding each month, and that the loan began to incur default interest[14] beginning with the June 2022 statement. (*Id.* at 19-24.)    This pattern continued over time, and Guarantor's records show that by the time the June 2023 statement was issued, Borrower owed $58,767.82 in default interest, $4,291.52 in late charges, and $21,457.64 in interest and principal payments. (*Id.* at 31.)    As of the January 2024 statement, Borrower owed $82,780.19 in default interest, $5,632.62 in late payments, and $16,093.23 in interest and principal payments. (*Id.* at 37.)    Thus, Guarantor's records show that Borrower was in default at the time Plaintiff provided notice of default on May 26, 2023. (Compl. at ¶ 36.)

The Court questions how the 1078 Whillmore Defendants can argue in good faith that the default has not been established "upon competent, admissible evidence." (Def't Opp. at 12.)    The Guarantor's own Affidavit provides all the evidence that the Court needs of the Borrower's payment default. The very first "event of default" listed in the Loan Agreement, Section 8.01(a), is a situation in which "Borrower fails to pay or deposit when due any

---

[13] Section 5(a) of the Note provides that Borrower must pay a late charge of 5% of any overdue payment or amount due. (Doust Decl. Ex. 2, at 7.)
[14] Section 5(b) of the Note provides that, upon an Event of Default, the interest rate applicable to the Loan will increase to the Fixed Annual Interest Rate or the Variable Annual Interest Rate, as applicable, plus 4%. (Doust Decl. Ex. 2, at 7.)

amount required by the Note, this Loan Agreement or any other Loan Document." (Doust Decl. Ex. 1 at 35.) Guarantor's records make it crystal clear that, on several occasions from January 2022 onward, Borrower failed to pay or deposit the amounts required by the Note, such failure constituting an event of default under the Loan Agreement. As such, the Court does not find there to be any real dispute regarding the factual allegations made in the Complaint regarding Borrower's payment default.

### 3. Appointment of a Receiver is Appropriate

Having dispensed with the 1078 Whillmore Defendants' arguments regarding the provenance of Plaintiff's evidence or the presence of an event of default, the Court will next turn to whether the appointment of a receiver is appropriate in the instant case.

In addition to arguing that appointment of a receiver is explicitly authorized by the Mortgage, Plaintiff further argues that a receivership is appropriate because (1) there is imminent danger that the Property and the associated rents, both of which serve as collateral to the Loan, will suffer waste and diminish in value in the absence of a receivership; (2) Plaintiff's legal remedies are inadequate in the absence of an appointed receiver given the nonrecourse nature of the loan; (3) Plaintiff has shown its likelihood of success on the merits; and (4) the proposed receiver is well-suited to take possession of the Property and

37

avoid irreparable harm to the property.  (Pl. Mem. at 3-6.)
Defendants argue in response that the current property manager
"stand[s] the best chance of maximizing rent collections and
preserving the Property during the pendency of this action" and
that the "appointment of a Receiver would [] add no value, as it
would only result in the collection of fees by the Receiver and
thus diminish the amount of money on hand to pay the monthly
expenses associated with maintaining the Property."  (Def't Opp.
at 17-18.)

The Court finds that the Mortgage specifically contemplates
and authorizes Plaintiff to seek a receivership, a factor
"militating in plaintiff's favor." *D.B. Zwirn*, 550 F. Supp. 2d at
491.  Here, as in *D.B. Zwirn,* the Mortgage includes language
stating that Plaintiff "may apply to any court having jurisdiction
for the appointment of a receiver . . . [and] Borrower, by its
execution of this Instrument, expressly consents to the
appointment of such receiver."  (Doust Decl. Ex. 3 at 25); *see
also D.B. Zwirn*, 550 F. Supp. 2d at 484 (setting forth the
contractual provision on appointment of temporary receiver,
including language regarding consent).  The Court notes that the
Second Circuit has also found the appointment of a receiver to be
appropriate when the parties' agreement specifically authorizes
such an appointment in the event of default.  *See Citibank v.
Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988) ("It is entirely

appropriate for a mortgage holder to seek the appointment of a receiver where the mortgage authorizes such appointment, and the mortgagee has repeatedly defaulted on conditions of the mortgage which constitute one or more events of default."). Because the Court finds that the parties' agreement specifically contemplates the appointment of a receiver, and it is clear that an event of default has occurred, "the party opposing the appointment bears the burden of demonstrating why a receiver should not be appointed." *D.B. Zwirn*, 550 F. Supp. 2d at 491 (S.D.N.Y. 2008). The Court does not find that Defendants have met their burden.

Plaintiff sets forth facts showing that several factors weigh in favor of a receivership. Although Plaintiff does not allege that the 1078 Whillmore Defendants have engaged in any fraudulent conduct, courts in this circuit have appointed receivers even where there was no evidence of fraud. *See id.*; *see also United States v. Trusty Cap., Inc.*, No. 06-CV-8170 (KMK), 2007 WL 44015, at *8 (S.D.N.Y. Jan. 5, 2007) (granting plaintiff's motion for appointment of receiver even in the absence of evidence of fraud where defendant defaulted on its payments to plaintiff).

*First,* the Court finds that there is danger that the Property and the associated rents will suffer waste or diminish in value in the absence of a receiver. The Doust Declaration states that the Property is "subject to no less than, *inter alia*, two (2) New York City Environmental Control Board judgments and six (6) open New

39

York City Department of Building violations in addition to a multitude of open rent stabilization charges and dwelling registration charges." (Doust Decl. at ¶ 24.) Referencing the attached exhibit, the Court notes that two of the open Department of Buildings ("DOB") violations were filed in April 2023. (ECF 23-12, Doust Decl. Exhibit 12, at 2[15].) The 1078 Whillmore Defendants have also failed to remit the rents due to Plaintiff, as provided under Section 3(a) of the Mortgage. (Doust Decl. Ex. 3 at 23 ("As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents . . . [but] [u]ntil the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents . . .").)

Although the 1078 Whillmore Defendants state that they are "ready, willing, and able to submit accountings to the Court and Plaintiff each month demonstrating that Borrower has been collecting the rents remitted by the tenants, segregating those funds and using monies to pay the monthly expenses for the Property," the 1078 Whillmore Defendants offer no explanation for their failure to provide a proper accounting (or turnover the associated rents) to date. (Def't Opp. at 17.) In light of the facts proffered by Plaintiff regarding the number of open

---

[15] Because Exhibit 12 to the Doust Declaration is not internally paginated, the Court utilizes the ECF-assigned page number for its pincites.

violations on the Property, and the 1078 Whillmore Defendants'
failure to comply with their obligation to turn over the rents to
Plaintiff, the Court finds there is a risk of waste or loss of
value to the Property and associated rents.

*Second,* the Court finds that Plaintiff's legal remedies in
the absence of a receiver are inadequate.  Because the loan is
generally nonrecourse, as discussed *supra*, Plaintiff's recovery is
limited to the Property, with a handful of exceptions for specific
losses or damages set forth in Section 3.03 of the Loan Agreement.
(Doust Decl. Ex. 1 at 3-5.)  Therefore, any waste or damage to the
Property would generally not be recoverable by Plaintiff, an
outcome which the Plaintiff notes led to Borrower giving its "prior
consent to an appointed receiver in precisely this instance." (Pl.
Mem. at 6.)  Therefore, the Court finds that this factor weighs in
favor of the appointment of a receiver.

*Third,* for the reasons discussed *supra* in evaluating the 1078
Whillmore Defendants' motion to dismiss, the Court finds a strong
probability that Plaintiff will prevail on the merits in this
action.  Plaintiff has set forth a prima facie showing of standing,
and the Court finds that the 1078 Whillmore Defendants' own
documentary evidence clearly shows evidence of a payment default,
even setting aside the financial reporting default.  Therefore,
the Court finds a likelihood of success on the merits.

*Finally,* the Court finds that harm to the Plaintiff by denial of the motion for a receivership would be greater than any harm to the 1078 Whillmore Defendants.  The 1078 Whillmore Defendants argue that the fee charged by a receiver will "diminish the amount of money on hand to pay the monthly expenses associated with maintaining the Property," (Def't Mem. at 18), but the Plaintiff states that the proposed "Receiver, if appointed, has agreed to waive his receivership fee and that his proposed property manager, Syracuse Realty Group, would earn a management fee in place of the management fee that Borrower's property manager currently earns," (Pl. Reply at 13).   Furthermore, other courts examining the relative harm to the parties have noted that a contractual provision providing for a receivership suggests "a significant diminution of [defendants'] interest due to its voluntary accession to a receivership remedy in the bargaining process." *Kairos Credit Strategies Operating P'ship, LP v. Friars Nat'l Ass'n, Inc.,* No. 23-CV-2960 (JPO), 2023 WL 3675921, at *3 (S.D.N.Y. May 26, 2023).  Accordingly, and in light of the fact that the Property's rents should be turned over to Plaintiff under the operative loan documents, the Court finds that the appointment of a receiver would not cause a greater injury to the 1078 Whillmore Defendants than would be caused to Plaintiff if a receiver is not appointed.

To the extent the 1078 Whillmore Defendants argue that Borrower's current property manager has a special relationship with the tenants of the Property, and "[t]he tenants at the Property are very unlikely to understand the concept of a receiver being appointed for the Property and are likely to attempt to take advantage of same by not remitting rents to anyone," the Court does not find Defendants' argument availing. (Def't Opp. at 4.) The receiver could always coordinate with the existing property manager to avoid such difficulties, but such a special relationship has previously been found by other courts as "insufficient to justify leaving [Defendants'] assets entirely in [their] hands." *Trusty Cap., Inc.,* 2007 WL 44015, at *9. Therefore, the Court finds that this factor does not prevent the Court from appointing a receiver.

In light of the foregoing analysis, the Court finds that it is appropriate to appoint a receiver in the instant case.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff's Motion to Appoint Orazio Crisalli of Syracuse Realty Group, LLC, 570 Lexington Avenue, Suite 1600, New York, New York 10022, as Receiver for the assets of defendant 1078 Whillmore LLC, including certain real property and improvements located at 1078 Willmohr Street, Brooklyn, New York, designated as Block 4691 Lot 7 Tax Map of the City of New York, County of Kings, is **GRANTED**. The 1078 Whillmore Defendants' Motion to Dismiss for lack of standing and for failure to state a claim is respectfully **DENIED**.


**SO ORDERED**

Dated:    July 3, 2024
          Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York